IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | |
|---|---|
| DAVID F. THOMPSON, <br>     Plaintiff, | ) <br> ) <br> ) |
| v. | )    CIVIL NO. 3:12cv683 (HEH) |
| | ) |
| CAROLYN W. COLVIN, <br>     Commissioner of Social Security, <br>     Defendant. | ) <br> ) <br> ) <br> ) |

## REPORT AND RECOMMENDATION

David F. Thompson ("Plaintiff") is 58 years old and worked as a roofer and roofing foreman. On May 12, 2005, Plaintiff applied for Social Security Disability ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act") with an alleged onset date of March 27, 1996, claiming disability due to degenerative joint disease of the right knee, right trochanteric bursitis of the hip and arthritis. Plaintiff's claim was presented to an administrative law judge ("ALJ"), who denied Plaintiff's request for DIB, but found that Plaintiff was eligible for SSI beginning June 1, 2005. The Appeals Council subsequently denied Plaintiff's request for review on August 6, 2012.

Plaintiff now challenges the ALJ's denial of DIB, asserting that Dr. Cooke provided incorrect dates in his report. (Plaintiff's Memorandum in Support of Motion for Summary Judgment ("Pl.'s Mem.") at 1.) Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). The parties have submitted cross-motions for summary judgment, which are now ripe for review.[1] Having reviewed the parties' submissions and the

---

[1] The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any

entire record in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, it is the Court's recommendation that Plaintiff's Motion for Summary Judgment (ECF No. 12) be DENIED; that Defendant's motion for summary judgment (ECF No. 15) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

I. BACKGROUND

Plaintiff challenges whether substantial evidence supported the ALJ's determination to deny Plaintiff DIB benefits. Therefore, Plaintiff's educational and work history, medical history, consulting physician's opinions, reported activities of daily living and the hearing testimony are summarized below relating to Plaintiff's life before January 1, 2002, when his insured status under the Act expired.

A. Plaintiff's Education and Work History

Plaintiff is 58 years old and has a tenth grade education. (R. at 53, 208.) He worked as a roofer and a roofing foreman for over 20 years, before he had to quit due to his disabilities in 1996. (R. at 93.) This job involved nailing, loading trucks, tearing off roofs, installing new roofs and assembling gutters. (R. at 93.) This position involved climbing, standing, stooping, kneeling, crouching and lifting more than 100 pounds. (R. at 94.) Plaintiff sought self-employment, but did not earn more than $2,000 a year. (R. at 207.)

---

personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

B.  Plaintiff's Medical History

On March 7, 1990, Plaintiff reported to Dr. William Johnstone, M.D., for an evaluation of numbness and tingling in his wrists. (R. at 127.) Dr. Johnstone diagnosed that Plaintiff likely had tendonitis and De Quervain's disease and that it was related to his work. (R. at 127.) Plaintiff's x-rays of his wrists were unremarkable. (R. at 127.) At Dr. Johnstone's recommendation, Plaintiff underwent surgery on his left wrist, which "went well." (R. at 127.) On April 23, 1990, Plaintiff underwent a second wrist surgery, this time on his right wrist. (R. at 126.)

On April 11, 1996, Plaintiff saw Dr. Joseph F. Meyers, M.D., during which Plaintiff complained about right shoulder pain after he fell from a roof two weeks earlier. (R. at 136.) An x-ray of Plaintiff's right shoulder indicated a second degree AC separation. (R. at 136.) Dr. Myers indicated that Plaintiff should take Tylox for pain and could return to work in two weeks. (R. at 136.) During Plaintiff's April 25, 1996 appointment with Dr. Meyers, Plaintiff still experienced discomfort, but Dr. Meyers noted that Plaintiff had "improved remarkably" since Plaintiff's last visit. (R. at 136.) Dr. Meyers recommended that Plaintiff should not return to work for another month. (R. at 136.) On May 9, 1996, Dr. Meyers indicated that Plaintiff still had problems with his shoulder relating to his fall from the roof and Dr. Meyers administered a cortisone injection. (R. at 135.) Dr. Meyers noted that Plaintiff suffered a previous injury 20 years earlier, but no problem arose until his recent fall. (R. at 135.) During Plaintiff's next appointment on May 21, 1996, Dr. Meyers indicated that the cortisone injection provided no relief to Plaintiff. (R. at 135.)

During Plaintiff's June 11, 1996 appointment, Dr. Meyers removed the sutures from Plaintiff's wound and noted that the wound had healed, but Plaintiff still experienced discomfort

(R. at 135.) By June 25, 1996, Plaintiff's range of motion returned to his shoulder, but he continued to complain of soreness. (R. at 135.) Dr. Meyers began Plaintiff on a physical therapy regimen. (R. at 135.) On July 16, 1996, Plaintiff complained of soreness from the physical therapy. (R. at 134.) Dr. Meyers ordered an x-ray that demonstrated that Plaintiff had a gap between his acromion and his clavicle and prescribed Nasprosyn. (R. at 134.) During Plaintiff's July 30, 1996 appointment with Dr. Meyers, Plaintiff received a Celestone and Macaine injection, because of a trigger point on Plaintiff's clavicle. (R. at 134.) Plaintiff complained of pain and Dr. Meyers continued Plaintiff's physical therapy treatment. (R. at 134.)

On August 20, 1996, Plaintiff reported having less pain in his shoulder and Dr. Meyers noted that Plaintiff was "better" this time. (R. at 133.) Dr. Meyers indicated that Plaintiff made some progress with his physical therapy by September 10, 1996. (R. at 133.) While Plaintiff still indicated that he experienced tenderness under his clavicle, Dr. Meyers recommended that Plaintiff use Capsaicin on his shoulder. (R. at 133.) On October 1, 1996, Dr. Meyers stated that Plaintiff "made progress," "had full active motion of the shoulder now" and was "fairly pain free" in spite of some pain associated with external rotation of his shoulder against resistance. (R. at 133.) Dr. Meyers recommended three more weeks of physical therapy. (R. at 133.) During Plaintiff's October 22, 1996 appointment, Dr. Meyers opined that Plaintiff could return to light work, but indicated that Plaintiff should not do any work above the shoulder, should not lift more than 20 pounds and should not swing a hammer. (R. at 133.)

Dr. Meyers performed arthroscopic surgery on Plaintiff's right shoulder on December 30, 1996, in relation to Plaintiff's AC liability. (R. at 137.) Plaintiff underwent the surgery with no complications. (R. at 138.) On January 9, 1997, Plaintiff returned to Dr. Meyers for a post-operation follow-up appointment, during which Dr. Meyers removed Plaintiff's staples from the

surgery. (R. at 142.) Dr. Meyers noted that there was no sign of infection and recommended that Plaintiff continue to remain in a shoulder immobilizer for two weeks. (R. at 142.) During Plaintiff's January 23, 1997 appointment, Dr. Meyers indicated that Plaintiff was "doing well." (R. at 142.) On February 6, 1997, Plaintiff reported no pain in the back of his trapezius and "a little soreness" in the front of his shoulder. (R. at 142.) Dr. Meyers continued Plaintiff's physical therapy treatment. (R. at 142.)

During Plaintiff's February 27, 1997 appointment, Dr. Meyers wrote that Plaintiff was "doing well" and that his range of motion had increased. (R. at 142.) While Plaintiff had no AC joint soreness or deformity, Plaintiff complained of some anterior soreness for which Dr. Meyers administered Naprosyn to Plaintiff. (R. at 142.) Dr. Meyers continued Plaintiff's physical therapy regimen. (R. at 142.) On March 20, 1997, Plaintiff visited Dr. Meyers, who noted that Plaintiff was "doing very well" with a fair amount of aching in his subacromial bursa for which Dr. Meyers administered a cortisone injection. (R. at 169.)

During Plaintiff's April 14, 1997 appointment, Dr. Meyers determined that Plaintiff had 4/5 strength in his rotator cuff with almost full range of motion. (R. at 169.) Plaintiff still complained of pain in his arm, but began a home exercise program. (R. at 169.) On May 20, 1996, Plaintiff continued to complain of pain in his right shoulder in overhead activities, but Dr. Meyers found that Plaintiff maintained 4/5 strength in that shoulder. (R. at 169.) Dr. Meyers ordered an x-ray which demonstrated no motion in Plaintiff's superior plane. (R. at 169.) Dr. Meyers opined that Plaintiff would not be able to return to work as a roofer. (R. at 169.)

On July 3, 1997, Dr. Meyers compiled a Functional Capacity Evaluation in which he opined that Plaintiff could perform heavy work with a load limitation of 41 pounds when lifting from the floor to 30 inch vertical planes and 21 pounds when lifting to shoulder height. (R. at

5

144.) Plaintiff was restricted in his ability of overhead lifting, could push and pull occasionally and was limited in his ability to reach and handle with his right hand to vertical work planes below 50 inches. (R. at 144.) Plaintiff could never climb a ladder and had a permanent impairment rating of 21% of the right upper extremity. (R. at 144.)

On July 15, 1997, Plaintiff attended his final follow-up appointment with Dr. Meyers, during which Plaintiff stated that he was fairly comfortable with his activities of daily living and only felt shoulder pain when he partook in heavy activities. (R. at 169.) Plaintiff was released from Dr. Meyers' care that day except for on-a-need basis. (R. at 169.) On June 4, 1998, Plaintiff reported to Dr. Meyers, complaining that his right shoulder swelled during heavy activity. (R. at 168.) Dr. Meyers indicated that Plaintiff's x-ray looked fine, there was no deformity of the shoulder and the clavicle was in a good position. (R. at 168.) Dr. Meyers administered Feldene to Plaintiff for swelling. (R. at 168.)

Plaintiff visited Dr. Meyers on July 25, 2000, complaining of pain in his right knee and foot, attributing the pain to standing for long periods of time and climbing ladders. (R. at 167.) At the time, Plaintiff took no medication. (R. at 167.) Dr. Meyers noted that the x-ray demonstrated narrowing of Plaintiff's medial joint space with spurring and a pipartite patella. (R. at 167.) Plaintiff had full range of motion in his knee and a normal gait. (R. at 167.)

On August 15, 2000, Plaintiff visited Dr. Meyers with a torn posterior cruciate ligament from an earlier motorcycle accident which caused Plaintiff to suffer from arthritis. (R. at 166.) Dr. Meyers recommended that Plaintiff take anti-inflammatory medication and wait longer to undergo a knee replacement. (R. at 166.) During Plaintiff's October 10, 2000 appointment, Plaintiff reported that the anti-inflammatory medication did not help his condition. (R. at 165.) Dr. Meyers suggested a regime of Synvisc injections. (R. at 165.) Plaintiff received the

injections in his right knee on February 1, 2001, February 8, 2001 and February 15, 2001. (R. at 162-64.)

C.     Non-treating State Agency Physician Opinion

On July 12, 2006, Dr. Charles Cooke, M.D., offered his opinion of Plaintiff's condition from the period of March 27, 1996 through December 21, 2001. (R. at 179-87.) Dr. Cooke opined that, during the relevant time period, Plaintiff sustained an impairment due to a problem with his right shoulder. (R. at 181.) However, Dr. Cooke noted that Plaintiff's condition did not meet the Listings under § 1.02. (R. at 181.) Dr. Cooke noted that there was a break in the record from 1997 until 2004 regarding Plaintiff's knee problems. (R. at 181.)

Dr. Cooke also offered his opinion of Plaintiff's condition from January 1, 2002 until the present. (R. at 181.) Again, Dr. Cooke found that Plaintiff sustained severe impairments and that Plaintiff's condition did not meet the Listings under § 1.02. (R. at 181.) Dr. Cooke opined that Plaintiff could not presently perform his past heavy work, but could perform sedentary work. (R. at 182.) Plaintiff could occasionally carry or lift ten pounds, frequently carry or lift less than ten pounds, could stand or walk for at least two hours in an eight-hour work day and was limited in his ability to push and pull with his upper and lower extremities. (R. at 185-86.) Dr. Cooke found that Plaintiff was not limited in his ability to sit, but that Plaintiff could never climb, crouch or crawl. (R. at 186.) Plaintiff could occasionally balance or kneel, and was limited in his ability to reach in all directions. (R. at 186-87.) Dr. Cooke opined that Plaintiff's exposure to hazards should be limited. (R. at 187.)

D.     Plaintiff's Activities of Daily Living

Plaintiff submitted an activities of daily living ("ADLs") report dated December 27, 2005, in which Plaintiff wrote that he was married and lived at home with his wife. (R. at 81.)

Before he suffered an injury in which he fell from a roof, Plaintiff reported to work every day, indicated that he was the "best roofer" from 1971 until he underwent hand surgery in 1990 and had no problem getting along with co-workers and supervisors. (R. at 85.) After his hand surgery, Plaintiff could no longer tear off roofs because of the pain, but continued to work for the company. (R. at 85.)

E.   Plaintiff's Testimony

Plaintiff testified at a hearing on July 5, 2006, without representation of an attorney, regarding his condition before his date last insured on December 31, 2001. (R. at 203, 209.) Plaintiff testified that he was involved in a motorcycle wreck in 1975 and suffered injuries when he fell from a roof while working in 1996. (R. at 207.) Plaintiff stated that he could not work after 1996, but tried to work roofing part-time from which he earned less than $2,000 a year. (R. at 207.) Plaintiff chronicled that he underwent two hand surgeries in 1990 for his De Quervain's disease and two shoulder surgeries, one in December of 1996 and one in 1997. (R. at 210.) Before 2001, Plaintiff suffered hip, knee, shoulder and hand pain. (R. at 210.) He attributed an increase in his knee pain to the fall from the roof. (R. at 211.) Plaintiff took pain medicine on a daily basis. (R. at 211.) He also noted that he suffered depression after he fell off the roof in 1996. (R. at 212.) During the relevant time period, Plaintiff saw Dr. Meyers, Dr. Johnstone and Dr. Ash. (R. at 212.)

Plaintiff could not lift anything over his shoulders, but could do some small lifting up to about 21 pounds. (R. at 213.) Plaintiff offered that he could not use his hands at work anymore, but that his employer continued Plaintiff's employment. (R. at 215.) He could not use a screwdriver, but could use a hammer. (R. at 215.)

8

F.   Vocational Expert Testimony

A vocational expert ("VE") testified at the hearing on July 5, 2006. (R. at 216.) He reviewed the written evidence and observed the testimony during the hearing. (R. at 216.) The VE indicated that Plaintiff's past relevant work as a roofer and roofer foreman constituted medium-exertion skilled work and that these skills were not transferable. (R. at 216.) The ALJ asked the VE to imagine that Plaintiff had the RFC to perform sedentary work during the time that he was classified as a younger individual under the act with the same vocational profile as Plaintiff who suffered pain in his back, hands, hips, shoulders and right knee, and depression to the frequency and severity to preclude activity. (R. at 216-17.) The VE testified that if the pain was severe, it was unlikely that Plaintiff would be able to maintain gainful employment. (R. at 217.) The ALJ next asked the VE to consider that Plaintiff's pain was only mild to moderate in nature. (R. at 217.) If the severity was mild or moderate, the VE opined that Plaintiff could perform work as a charge account clerk, a small parts assembler and inspector. (R. at 217.) In the national economy, those positions include 31,000 jobs, 155,000 jobs and 38,000 jobs, respectively. (R. at 217.)

## II. PROCEDURAL HISTORY

Plaintiff protectively filed for DIB and SSI on May 12, 2005, claiming disability due to degenerative joint disease, trochanteric bursitis of the hip and arthritis with an alleged onset date of March 27, 1996. (R. at 16, 18.) The Social Security Administration ("SSA") denied Plaintiff's DIB claims initially and on reconsideration.[2] (R. at 16.) However, Plaintiff's SSI claim was

---

[2]   Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. pt. 404, subpt. Q; *see also* § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

9

granted and he could receive benefits beginning on June 1, 2005. (R. at 16.) On July 5, 2006, Plaintiff had a hearing before an ALJ regarding Plaintiff's DIB claim. (R. at 203.)

The ALJ issued a decision on October 5, 2006 and reissued the decision on September 10, 2010, finding that Plaintiff was not entitled to DIB under the Act. (R. at 13, 24B-24L.) The Appeals Council subsequently denied Plaintiff's request to review the ALJ's decision on August 6, 2012, making the ALJ's decision the final decision of the Commissioner and subject to judicial review by this Court. (R. at 6.)

### III. QUESTIONS PRESENTED

1. Did substantial evidence exist to support the ALJ's finding that Plaintiff could perform sedentary work from his alleged disability onset date until his date last insured?

2. Did the ALJ's reliance upon Dr. Cooke's opinion constitute reversible error?

### IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.* (citations omitted); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citations and internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir.

2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) (internal quotation marks omitted)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[3] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical

---

[3] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

condition. *Id.* If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] his physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to his past relevant work[4] based on an assessment of the claimant's residual functional capacity ("RFC")[5] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude

---

[4] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[5] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

him from performing his past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry his burden in the final step with the testimony of a vocational expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

### A. The ALJ's Analysis

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since March 27, 1996, and that Plaintiff last met the insured status requirement under the Act on December 31, 2001. (R. at 18.) At step two, the ALJ determined that Plaintiff was severely impaired from degenerative joint disease of the right knee, right trochanteric bursitis of the hip and arthritis of the acromioclavicular joint. (R. at 18-19.) At step three, the ALJ concluded that

Plaintiff's impairments did not meet the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1. (R. at 19.) The ALJ then determined that Plaintiff had the RFC to lift and/or carry up to ten pounds frequently, stand and/or walk up to two hours overall in an eight-hour workday and sit for up to six hours overall in an eight-hour workday. (R. at 19.) Plaintiff is also limited in that he cannot engage in above the shoulder work with his right upper extremity and cannot swing a hammer, kneel, crawl, stoop, squat and climb ladders, scaffolds or ropes. (R. at 19.) At step four, the ALJ determined that the Plaintiff was unable to perform his past relevant work. (R. at 21.)

At step five, the ALJ determined that Plaintiff was 41 years old on the alleged onset date of his disability, categorizing Plaintiff as a younger individual. (R. at 22.) However, on August 31, 2004, Plaintiff turned 50 years old, which changed Plaintiff to an individual closely approaching advanced age. (R. at 22.) For DIB benefits, considering Plaintiff's age category at the time before his date last insured, RFC, education and work experience, the ALJ found that significant jobs existed in the national economy that Plaintiff could have performed through December 31, 2001, the date he was eligible for DIB. (R. at 22.)

Plaintiff now argues that the ALJ erred by finding that Plaintiff could perform sedentary work before date last insured and erred because Dr. Cooke's opinion used incorrect dates and facts which the ALJ relied upon. (Pl.'s Mem at 1.) Defendant contends that substantial evidence supports the ALJ's determination that Plaintiff maintained the RFC to perform sedentary work. (Def.'s Mem. at 19-26.) Further, Defendant claims that, while Dr. Cooke's opinion might have used the wrong dates in his report, Dr. Cooke's opinion that Plaintiff could perform sedentary work dealt with Plaintiff's present RFC, not Plaintiff's RFC during the time before January 1, 2002, which is at issue here. (Def.'s Mem. at 26-27.) Therefore, the ALJ did not rely upon this

opinion in finding Plaintiff was not disabled under the Act for DIB benefits. (Def.'s Mem. at 26-27.)

Here, the issue before the Court deals solely with Plaintiff's eligibility for DIB benefits, which concerns Plaintiff's condition from the alleged onset date until Plaintiff's date last insured. Plaintiff is receiving SSI benefits that began in June 2005. Therefore, the relevant time period for review is from March 27, 1996 through December 31, 2001.

> B. Substantial evidence supports the ALJ's determination that Plaintiff could perform sedentary work from March 27, 1996 until December 31, 2001.

Plaintiff argues that, after he fell off the roof in 1996, he was unable to work due to his pain and discomfort. (Pl.'s Mem. at 1.) Defendant responds that substantial evidence supports the ALJ's decision that Plaintiff could perform sedentary work from the time of his injury in 1996 until Plaintiff's last date insured on December 31, 2001. (Def.'s Mem. at 19-27.)

Here, the ALJ determined that, from March 27, 1996 until December 31, 2001, Plaintiff had the RFC

> to lift and/or carry up to ten pounds frequently; stand and/or walk up to two hours overall in an eight hour workday; and sit . . . up to six hours overall in an eight hour work day. [Plaintiff] is limited nonexternionally in that he cannot do above shoulder work with his right upper extremity and cannot swing a hammer. He cannot kneel crawl, stoop or squat. He cannot climb ladders, scaffolds or ropes.

(R. at 19.) "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. 404.1567(a). A sedentary job "involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." *Id.* "Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id.* In making this determination, the ALJ

considered all medical and other evidence as required by 20 C.F.R. 404.1529 and 416.929 and SSRs 96-4p and 96-7p. (R. at 19-20.)

Plaintiff's medical records from Plaintiff's treating physician, Dr. Meyers, support the ALJ's determination that Plaintiff could perform the work described above. Specifically, on April 25, 1996, during Plaintiff's second appointment with Dr. Meyers, Plaintiff still experienced discomfort, but Dr. Meyers noted that Plaintiff had "improved remarkably" since Plaintiff's last visit. (R. at 136.) By June 25, 1996, Plaintiff's range of motion returned to his shoulder. (R. at 135.) On August 20, 1996, Plaintiff reported having less pain in his shoulder and Dr. Meyers noted that Plaintiff was "better" this time. (R. at 133.) Dr. Meyers indicated that Plaintiff made some progress with his physical therapy by September 10, 1996. (R. at 133.) On October 1, 1996, Dr. Meyers stated that Plaintiff "made progress," "had full active motion of the shoulder now" and was "fairly pain free" in spite of some pain associated with external rotation of his shoulder against resistance. (R. at 133.)

After Dr. Meyers performed shoulder surgery on Plaintiff, Dr. Meyers indicated that Plaintiff was "doing well" during Plaintiff's January 23, 1997 appointment. (R. at 142.) On February 6, 1997, Plaintiff reported no pain in the back of his trapezius and "a little soreness" in the front of his shoulder. (R. at 142.) During Plaintiff's February 27, 1997 appointment, Dr. Meyers wrote that Plaintiff was "doing well" and that his range of motion increased. (R. at 142.) While Plaintiff had no AC joint soreness or deformity. (R. at 142.) On March 20, 1997, Plaintiff visited Dr. Meyers who noted that Plaintiff was "doing very well" with a fair amount of aching in his subacromial bursa for which Dr. Meyers administered a cortisone injection. (R. at 169.)

During Plaintiff's April 14, 1997 appointment, Dr. Meyers determined that Plaintiff had 4/5 strength in his rotator cuff with almost full range of motion. (R. at 169.) Plaintiff still

complained of pain in his arm, but began a home exercise program. (R. at 169.) On May 20, 1997, Plaintiff continued to complain of pain in his right shoulder in overhead activities, but Dr. Meyers found that Plaintiff maintained 4/5 strength in that shoulder. (R. at 169.) Dr. Meyers ordered an x-ray which demonstrated no motion in Plaintiff's superior plane. (R. at 169.)

On July 15, 1997, Plaintiff attended his final follow-up appointment with Dr. Meyers, during which Plaintiff stated that he was fairly comfortable with his activities of daily living and only felt shoulder pain when he partook in heavy activities. (R. at 169.) Plaintiff was released from Dr. Meyers' care that day except for on-a-need basis. (R. at 169.) On June 4, 1998, Plaintiff reported to Dr. Meyers complaining that his right shoulder swelled during heavy activity, but Dr. Meyers indicated that Plaintiff's x-ray looked fine, there was no deformity of the shoulder and the clavicle was in a good position. (R. at 168.)

Plaintiff visited Dr. Meyers on July 25, 2000, complaining of pain in his right knee and foot, attributing the pain to standing for long periods of time and climbing ladders. (R. at 167.) Plaintiff had full range of motion in his knee and a normal gait. (R. at 167.)

Dr. Meyers' treating physician opinion also supports the ALJ's finding. On July 3, 1997, Dr. Meyers opined that Plaintiff could perform heavy work with a load limitation of 41 pounds when lifting from the floor to 30 inch vertical planes and 21 pounds when lifting to shoulder height. (R. at 144.) Plaintiff was restricted in his ability of overhead lifting, could push and pull occasionally and was limited in his ability to reach and handle with his right hand to vertical work planes below 50 inches. (R. at 144.) Plaintiff could never climb a ladder and had a permanent impairment rating of 21% of the right upper extremity. (R. at 144.)

Further, Plaintiff's own testimony provides substantial evidence to support the ALJ's determination of Plaintiff's RFC. Plaintiff testified that he could not lift anything over his

shoulders, but could do some small lifting of up to about 21 pounds. (R. at 213.) He could not use a screwdriver, but could use a hammer. (R. at 215.) Therefore, substantial evidence in the record supports the ALJ's determination that Plaintiff could perform the work described above from March 27, 1996 through December 31, 2001.

C. Errors in the dates iterated in Dr. Cooke's report do not constitute reversible error.

Plaintiff alleges that the ALJ relied upon a faulty report by Dr. Cooke, because the report contained incorrect dates and facts. (Pl.'s Mem. at 1.) Defendant contends that any error in Dr. Cooke's report did not create reversible error. (Def.'s Mem. at 26-27.)

Here, despite medical records that indicated that Plaintiff sought treatment from Dr. Meyers on June 4, 1998 for swelling in his right shoulder during heavy activity, on June 25, 2000 for pain to his right knee and foot, on August 15, 2000 for arthritis, on October 10, 2000 for inflammation to his knee and for Synvisc injections on February 1, 2001, February 8, 2001 and February 15, 2001 (R. at 162-68), Dr. Cooke noted that there was a break in the records from 1997 until 2004. (R. at 181.) While Dr. Cooke made this notation, he did not offer an opinion regarding Plaintiff's RFC from March 27, 1996 through December 31, 2001. (R. at 181.) Dr. Cooke's opinion regarding Plaintiff's ability to perform sedentary work stemmed from Plaintiff's condition from January 1, 2002 until the present. (R. at 181-82.) Further, Dr. Cooke's assessment of Plaintiff's ability to perform work-related activities relates to what Plaintiff "can still do despite his/her impairments," rather than Plaintiff's abilities during the relevant time period of March 27, 1996 through December 31, 2001. (R. at 185.) While there was an error in the dates, the error was harmless, as it played no role in the ALJ's analysis of Plaintiff's RFC from the time period of March 27, 1996 through December 31, 2001, and substantial evidence nonetheless supported Plaintiff's during that time.

## VI. CONCLUSION

For the reasons set forth herein, it is the Court's recommendation that Plaintiff's motion for summary judgment (ECF No. 12) be DENIED; that Defendant's motion for summary judgment (ECF No. 15) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Henry E. Hudson and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Dated: July 1, 2013